# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: June 17, 2026

Reissued for Public Availability: July 13, 2026

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| JOHN-KENRY GREENE and | * | |
| EMILY DOUANGMALA, | * | |
| parents and guardians of J.K.J.G., | * | |
| | * | |
| Petitioner, | * | No. 24-1513 |
| | * | |
| v. | * | Special Master Young |
| | * | |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * | * | |

*John-Kenry Greene and Emily Douangmala*, *pro se*, Washington, DC, for Petitioner.
*Emilie Williams*, U.S. Department of Justice, Washington, DC, for Respondent.

## DISMISSAL DECISION[1]

On September 27, 2024, John-Kenry Greene and Emily Douangmala ("Petitioners") filed a petition for compensation in the National Vaccine Injury Program ("the Program")[2] on behalf of their minor child, J.K.J.G. Pet., ECF No. 1. Petitioners alleged J.K.J.G. suffered from a complex febrile seizure resulting from diphtheria, tetanus, acellular pertussis ("Dtap"), haemophilus influenza type B ("Hib"), hepatitis B ("Hep B"), pneumococcal 20-valent ("Prevnar 20"), and inactivated polio ("polio") vaccines received on August 13, 2024. *Id.* at 1. Respondent argued against compensation, asserting that Petitioners' claim did not satisfy the six-month severity requirement and that J.K.J.G.'s symptoms were the result of his autism spectrum disorder ("ASD") diagnosis. Resp't's Rep. at 7–8, ECF No. 34.

A careful analysis and weighing of all the evidence presented in this case in accordance with the applicable legal standards reveals that Petitioners have failed to provide preponderant evidence that the Dtap, Hib, Hep B, Prevnar 20, and polio vaccines J.K.J.G. received on August 13, 2024, caused him to suffer from complex febrile seizure disorder. Accordingly, Petitioners are not entitled to an award of compensation.

---

[1] Pursuant to Vaccine Rule 18(b), this Decision was initially filed on June 17, 2026, and the parties were afforded 14 days to propose redactions. The parties did not propose any redactions. Accordingly, this Decision is reissued in its original form for posting on the court's website.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755 ("the Vaccine Act" or "Act"). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.    Procedural History

Petitioners filed their petition *pro se*, along with an initial set of medical records, on September 27, 2024. Pet., ECF No. 1.[3] As is my practice for all claims that are filed without representation, I ordered a status conference for June 27, 2025, to discuss how Petitioners should proceed. ECF No. 13. During the status conference, I suggested Petitioners seek to obtain counsel, and they represented that they would continue to collect the required medical records for filing. ECF No. 14. Accordingly, I afforded Petitioners 30 days to update me on the progress of seeking counsel. *Id.*

Petitioners filed several additional medical records throughout July 2025. Pet'r's Ex. 1, ECF No. 15; Pet'r's Ex. 2, ECF No. 16; Pet'r's Ex. 4, ECF No. 17; Pet'r's Ex. 3, ECF No. 18; Pet'r's Ex. 5, ECF No. 19; Pet'r's Ex. 6, ECF No. 20. On July 28, 2025, Petitioners filed a status report indicating they had retained counsel contingent on further neurological evaluation of J.K.J.G. and requested 30 days to file a notice of substitution of counsel. ECF No. 21. Based on this representation I granted Petitioners' request, and afforded them until August 28, 2025, to file an update regarding their procurement of counsel. ECF No. 22. Due to later scheduled medical appointments, on August 27, 2025, Petitioners requested another 45 day extension, or until October 14, 2025, to file with new counsel, and this was granted. *See* ECF Nos. 23–24.

On October 14, 2025, Petitioners filed a status report and medical records indicating that J.K.J.G. had been diagnosed with ASD and global developmental delay ("GDD") "following three post-vaccination seizure events." ECF No. 25 at 1.[4] J.K.J.G. had undergone magnetic resonance imaging ("MRI"), which revealed "no permanent brain injury," though Petitioners argued that "[t]he developmental delays are believed to be related to a post-vaccine encephalopathic reaction, similar in nature to the recognized pattern established in the *Hannah Poling* case."[5] *Id.* They stated that an attorney continued to review their case and requested another 30 days to file a motion for substitution of counsel. ECF No. 26. On October 15, 2025, I denied Petitioners' motion, noting that I had already afforded them an additional 45 days for their attorney to determine the extent of their representation. ECF No. 27. Instead, I ordered Petitioners to file a motion for substitution of counsel or a status report indicating their progress by October 29, 2025. *Id.*

Petitioners filed additional medical records[6] on October 29, 2025, along with a status report. ECF Nos. 28–29. Petitioners' status report noted that the attorney that had been reviewing their case had referred them to a different attorney, who had "not yet accepted or declined representation." ECF No. 29 at 1. They noted that "[m]any attorneys appear hesitant due to the behavioral label of 'autism,' despite clear evidence that the injury itself occurred after vaccination." *Id.* The status report stated J.K.J.G. had suffered from three alleged seizure episodes to-date. *Id.* However, Petitioners did not provide dates or documentation to support these

---

[3] The medical records filed on this date were not given an exhibit number.

[4] These records were not Bates stamped with exhibit numbers.

[5] Petitioners did not explain the significant of the *Hannah Poling* case and did not provide any factual comparison between J.K.J.G.'s symptoms and the facts of that case. Petitioners also did not file any articles related to the *Hannah Poling* case.

[6] These records were not Bates stamped with exhibit numbers.

allegations, and Petitioners represented that they would file these records. *Id.* Petitioners also questioned "the accuracy of official medical and emergency records," given that some contained typographic errors. *Id.* Petitioners concluded their status report by characterizing J.K.J.G.'s injury as "a vaccine-related encephalopathic event leading to [GDD] with secondary autism-like characteristics." *Id.* at 2.

In response to Petitioners' status report, on October 31, 2025, I issued an order noting that Petitioners had been afforded 125 days to obtain counsel and had remained unsuccessful. ECF No. 30. I further explained that both *pro se* petitioners and those represented by counsel are held to the same procedural requirements as it relates to evidence sufficiency and deadline adherence; thus I ordered Petitioners to either file a motion for substitution of counsel or a status report indicating their intent to proceed *pro se* by no later than December 1, 2025. *Id.* at 2. On December 1, 2025, Petitioners filed additional medical records, a "supplemental evidence statement" summarizing J.K.J.G.'s post-vaccination medical history, and a status report. ECF Nos. 31–32. Petitioners' status report stated that they continued to gather records for potential counsel to review but indicated their intent to proceed *pro se* at this time. ECF No. 32. Accordingly, on December 5, 2025, I issued an order directing Respondent to file his Rule 4(c) report by no later than February 3, 2026. ECF No. 33. In my order, I instructed Respondent to "specifically identify any records he believes is missing. Respondent was also to specifically identify issues with the case that would be a barrier to settlement negotiations, including, but not limited to, diagnosis and severity." *Id.*

Respondent filed his Rule 4(c) report, opposing compensation, on February 3, 2026. Resp't's Rep. Respondent noted in his report that in order to meet the Vaccine Act's severity requirement, Petitioners must show that J.K.J.G. "suffered the residual effects of his alleged injury through at least February 14, 2025." *Id.* at 7. Respondent observed that Petitioners had only provided evidence of two febrile seizures on August 13, 2024, and November 4, 2024. *Id.* Respondent also noted that no treating physician diagnosed J.K.J.G. with a "complex febrile seizure," but rather with a "simple febrile seizure." *Id.* at 8.

On February 6, 2026, I issued an order instructing Petitioners to either obtain counsel or address the issues contained in Respondent's Rule 4(c) report by no later than March 4, 2026. ECF No. 35. I explained the inherent difficulties of litigating off-Table cases as a *pro se* litigant, and noted that the issues raised in Respondent's report would further exacerbate these difficulties. *Id.* I also warned Petitioners that a failure to comply with the terms of my order would result in the issuance of an Order to Show Cause for failure to prosecute. *Id.*

On March 5, 2026, one day past the deadline, Petitioners filed their response to Respondent's Rule 4(c) report and additional medical records. ECF No. 37; Pet'r's Ex. 7, ECF No. 38.[7] Petitioners' response outlined J.K.J.G.'s initial febrile seizure approximately 12 hours after vaccination, and identified additional convulsions on November 4, 2024, and December 1, 2024. *Id.* at 3. Petitioners also contested Respondent's characterization of J.K.J.G.'s injury as a "simple febrile seizure," instead arguing it was a "complex febrile seizure." *Id.* at 4. Petitioners argued that they satisfied the six-month severity requirement because J.K.J.G. suffered from "ongoing concerns including [GDD]/autism-related care considerations." *Id.* Petitioners further noted their upcoming medical visits for J.K.J.G. and their unsuccessful attempts to retain counsel. *Id.* at 5.

---

[7] These documents were filed incorrectly, and later redocketed on March 10, 2026. *See* ECF No. 36.

On March 19, 2026, I issued an Order to Show Cause for failure to prosecute. ECF No. 40. In my order I explained that although Petitioners alleged J.K.J.G. is experiencing developmental delays as a result of his vaccines, "the medical records reflect a diagnosis of autism, and not an injury related to a seizure or that is vaccine caused." *Id.* at 1. Thus, I ordered Petitioners to show cause as to why this cause should not be dismissed for failure to prosecute, and instructed them that "[t]he filing of a substantive expert report addressing the issue of the six-month severity requirement and a biological mechanism for vaccine causation" would serve as compliance. *Id.* at 2. However, I warned Petitioners that their "self-authored filings alleging cognitive concerns and/or autism as vaccine-caused sequela will not constitute compliance with this Order." *Id.* Petitioner was to submit their response by May 18, 2026. *Id.*

Petitioners filed a response on March 26, 2026. ECF No. 42. Their response requested until the end of May due to an upcoming neurology appointment with Johns Hopkins Pediatric neurology on March 30, 2026, and an outpatient video electroencephalogram ("EEG") scheduled for April 20, 2026. *Id.* I found these requests reasonable, and thus extended Petitioners' response deadline to May 29, 2026. ECF No. 43. On May 22, 2026, Petitioners filed medical records, results from a May 17, 2026 EEG, and a status report. ECF No. 45. Petitioners requested their case not be dismissed because they were "actively prosecuting this matter, developing the medical record, and filing additional contemporaneous documentation." *Id.* The status report also noted that J.K.J.G. had suffered a "medical event" on April 10, 2026, while at an applied behavioral analysis ("ABA") therapy session. *Id.* On May 27, 2026, Petitioners filed another motion for extension of time and requested an additional 30 days to continue to file medical records. ECF No. 46. Their motion mentioned the records they filed with their prior status report, as well as an upcoming appointment at John's Hopkins Neurology on May 28, 2026. *Id.* at 1.

The same day, my law clerk emailed Petitioners to ask if they intended to file the records from J.K.J.G.'s March 2026 Johns Hopkins neurology appointment and April 2026 EEG, as these had not yet been filed (and Petitioners were still within their filing deadline). *See* Informal Comm., docketed June 1, 2026. Petitioners responded to my law clerk's email on June 1, 2026.[8] *Id.* Petitioners then filed medical records from Johns Hopkins neurology dated March 30, 2026, and May 28, 2026. ECF No. 48.

## II.     Medical History[9]

---

[8] On June 1, 2026, at 8:17 AM, my law clerk entered an informal communication on the docket noting that he "emailed Petitioners asking if they intended to file the medical records Petitioners previously requested time to file. Petitioners did not reply." *See* Informal Comm. docketed June 1, 2026. At 8:26 AM, Petitioners emailed my law clerk *ex parte* stating "I[] just got told that we didn't reply with documents for the case. I didn't receive anything where I saw to upload more medical records. What can I do to make sure that I can submit all documents and see what the special Masters is requesting? Thank you for your time." My law clerk responded at 8:30 AM by forwarding Petitioners his prior email and cc'ed Respondent's counsel. Thereafter, Petitioners indicated they would file additional medical records. *See* Informal Comm., docketed June 2, 2026.

[9] Several of the medical records filed by Petitioners did not include an exhibit number. Thus, where appropriate, I will refer to these by their ECF numbers as they appear on the docket.

J.K.J.G.'s medical history prior to vaccination was unremarkable. Pet'r's Ex. 3 at 14–30. J.K.J.G. was born on November 26, 2023, at which time he received the Hep B vaccine. *Id.* at 28. At his four-month well-child visit, he was noted to be undersized, though his later visits showed improved weight and growth. *Id.* at 14–15. J.K.J.G. received additional childhood vaccines without any complications on December 28, 2023, April 2, 2024, and May 2, 2024. *Id.* at 15, 20, 24.

On August 13, 2024, J.K.J.G. presented to his primary care provider ("PCP"), Paul Doherty, for his nine-month well-child visit. Pet'r's Ex. 3 at 9. His overall screening was normal, and J.K.J.G. received the vaccines in question at this visit. *Id.* at 12. Later that night, approximately six hours after receiving the vaccines, J.K.J.G.'s father found him "unconscious and unresponsive," prompting him to call 911 and perform CPR. Pet'r's Ex. 5 at 2. The paramedics were dispatched for possible cardiac arrest and abnormal breathing. ECF No. 28 at 1. J.K.J.G. was actively seizing when the paramedics arrived and Petitioners were instructed to stop compressions. *Id.* at 3. His seizures stopped before any medication was administered and his condition appeared to improve following the administration of ventilated oxygen. *Id.* Petitioners informed the paramedics that J.K.J.G. had received vaccinations earlier in the day and that he had been unresponsive for 25–30 minutes. *Id.* J.K.J.G. was transported to the hospital without any further events and noted to be postictal at the time of the paramedics' departure. *Id.*

J.K.J.G. arrived at the emergency department ("ED") of Children's National Hospital ("CNH") shortly after midnight on August 14, 2024, for further evaluation. Pet'r's Ex. 1 at 9. Petitioners stated that J.K.J.G. had felt "very, very hot" when he was feeding earlier in the evening, prompting his father to turn on the air conditioning. *Id.* When he walked back into the room J.K.J.G. was "making movements that looked 'like he was hiccupping or shrugging' a few times." *Id.* J.K.J.G. then "went limp" when his father tried to burp him, and his father was worried his throat was closing. *Id.* CPR did not initially work, prompting J.K.J.G.'s mother to push on his stomach, causing "mucus [to] com[e] out of his nose." *Id.* The treating physician, Rivka Thurm, noted that J.K.J.G. never stopped breathing during the incident and that his mother had a history of febrile seizure. *Id.* Petitioners expressed concern that his vaccines "may have precipitated this episode." *Id.* Dr. Thurm observed that J.K.J.G. was not experiencing a fever upon his arrival, and his temperature was "relatively low for febrile seizure." *Id.* at 10. An abdominal ultrasound and electrocardiogram ("EKG") were normal and J.K.J.G.'s labs were mildly elevated due to a viral illness. *Id.* Dr. Thurm's ultimate impression was a simple febrile seizure and instructed Petitioners to follow up with their PCP in two days. *Id.*

On August 19, 2024, J.K.J.G.'s mother spoke to Dr. Doherty on the phone. Pet'r's Ex. 3 at 6. She reported that J.K.J.G. had "turned purple" prior to CPR and that upon the paramedics' arrival, he "showed flatline." *Id.* She reported that the CNH ED suspected febrile seizure and cardiac arrest, and that J.K.J.G. was "limp on one side the following day," but now had full activity. *Id.* Dr. Doherty referred Petitioners to a neurologist and cardiologist and instructed them to follow up later that week. *Id.* at 7.

Petitioners returned to Dr. Doherty on August 22, 2024. Pet'r's Ex. 3 at 4. Dr. Doherty agreed with Dr. Thurm's assessment of febrile seizure given the history recounted by Petitioners, and advised that it was likely not a cardiac arrest. *Id.*

[Petitioners] ask[ed] if it is common for patients to get multip[le] vaccines at once, which [J.K.J.G.] did on the day of the event, and [Dr. Doherty] replied that his vaccines were standard vaccines. They dispute that characterization. At this point[ Petitioners] state that they do not wish to continue the visit and get up to leave. Asked [Petitioners] to stay, but they declined. Asked [Petitioners] to bring him to a pediatrician they trust for ongoing care if they do not wish to get care from me, which they state they will do as they leave the room.

*Id.* Though limited, Dr. Doherty's examination of J.K.J.G. was normal. *Id.* at 5.

Petitioners presented to neurologist David Horvat on August 26, 2024, for evaluation of his seizure episode. Pet'r's Ex. 1 at 119. J.K.J.G.'s examination was "non-focal [] with normal development." *Id.* at 121. Dr. Horvat opined that although the etiology of his symptoms was unclear, there was "lower concern for seizure based on loss of tone with event, which would be somewhat typical for a febrile seizure." *Id.* Dr. Horvat recommended J.K.J.G. undergo an EEG and potentially an MRI, pending the results of the EEG. *Id.* An EEG was performed on September 3, 2024, which was normal. ECF No. 1-1 at 21.

On September 6, 2024, Petitioners presented to cardiologist David Finkelstein for further evaluation of J.K.J.G.'s seizure episode. Pet'r's Ex. 1 at 129. They recounted J.K.J.G.'s history to Dr. Finkelstein, including his prior immunizations, and Dr. Finkelstein opined that J.K.J.G.'s symptoms were more consistent with a seizure than cardiac arrest. *Id.* at 130. An EKG was performed, which was normal, but Dr. Finkelstein recommended a 24-hour holter monitor be used to evaluate for intermittent issues. *Id.* He advised Petitioners to follow up again after the holter monitor was returned. *Id.* On September 25, 2024, Dr. Finkelstein informed Petitioners that the results of the holter monitor were normal. *Id.* at 131. Petitioners reported that J.K.J.G. was doing well at home and had not experienced any further events. *Id.*

Petitioners brought J.K.J.G. to MedStar Urgent Care on November 4, 2024, after finding him "unresponsive and seizing" for about ten minutes. ECF No. 31 at 12. J.K.J.G. was actively seizing upon arrival and noted to be febrile. *Id.* at 13. Petitioners reported that J.K.J.G. had not been breathing while in the car, but the treating physician noted that he was "awake and alert shortly after examination." *Id.* Petitioners declined treatment from emergency medical services and urgent care personnel and stated they would take J.K.J.G. to the ED. *Id.* Petitioners arrived at the CNH ED shortly after midnight on November 5, 2024, where they reported J.K.J.G. experienced a febrile seizure that morning. Pet'r's Ex. 1 at 132. The ED noted his prior fever at the urgent care was reported to be 104ºF, with "convulsions, bilateral upper extremity and lower extremity, nonfocal, some frothing, [and] blank stare without eye deviation or rolling." *Id.* at 135. Petitioners reported J.K.J.G. had been experiencing symptoms of an upper respiratory infection ("URI") for the past few days and had "been pulling at his ears." *Id.* Physician assistant ("PA") Aiden Shumway noted that J.K.J.G. was now afebrile and that the case was discussed with neurology, "though likely no need for follow-up given simple febrile seizure." *Id.* at 136. Petitioners were instructed to follow up with their PCP and were discharged. *Id.*

On December 1, 2024, Petitioners called emergency medical services due to a third seizure episode from J.K.J.G. ECF No. 31 at 15. The paramedics noted that J.K.J.G. was experiencing a

6

fever and non-epilepticus seizures. *Id.* at 18. Petitioners refused further services and J.K.J.G. was not transported to a hospital. *Id.* at 20.

J.K.J.G.'s next documented encounter occurred on September 23, 2025, when he underwent a brain MRI. ECF No. 25 at 3. The overall impression found a "[s]uspected premature closure of the sagittal suture . . . [and m]ildly decreased cerebral perfusion values," a possible sign of intracranial pressure. *Id.* at 4. However, "[n]o epileptogenic focus [was] identified." *Id.*

Later that month, on September 30, 2025, J.K.J.G. presented to the Developmental and Behavioral Clinic at MedStar Health for an assessment of GDD. ECF No. 25 at 5. Petitioners reported that J.K.J.G. had experienced complex febrile seizures since the receipt of his August 13, 2024 vaccines. *Id.* On examination J.K.J.G. was noted to be nonverbal with decreased eye contact, unresponsive to his name, exhibited "repetitive, sensory seeking behaviors," had poor motor skills, and was difficult to feed solid food. *Id.* at 5–7. Based on the examination and reports of Petitioners, J.K.J.G. was found to "meet criteria for a diagnosis of [ASD]." *Id.* at 9. The provider also explained that his febrile seizures were "relatively common in early childhood" and that these were likely unrelated to his autism. *Id.* Petitioners were advised to share the initial records from J.K.J.G.'s seizures for further evaluation and to start ABA therapy. *Id.* at 10.

The next documented medical encounter for J.K.J.G. was a visit with neurologist Janet Siddiqui on March 30, 2026. ECF No. 48 at 3. J.K.J.G.'s history of present illness section included diagnoses of "seizures, autism, [and] cranium stenosis." *Id.* The history further recounted J.K.J.G.'s prior three seizures, and further noted that his "language regressed after these events and he [was] currently nonverbal. . . . Doesn't respond to his own name." *Id.* at 4. Dr. Saddiqui noted that J.K.J.G. was diagnosed with autism in September 2025. *Id.* J.K.J.G. had suffered "no further generalized shaking events since" December 2024, but his staring episodes had become more frequent. *Id.* at 5. A September 23, 2025 brain MRI and a November 4, 2025 computed tomography ("CT") scan of his head revealed craniostenosis. *Id.* Petitioners reported that J.K.J.G. was currently enrolled in ABA therapy. *Id.* In her assessment, Dr. Saddiqui opined that J.K.J.G.'s symptoms were "most likely autistic behaviors/automatisms, but [could not] fully rule out focal seizures with impaired awareness as these events have not been captured on EEG." *Id.* at 7. She also reviewed the MRI of J.K.J.G.'s brain from September 23, 2025, which showed no epileptogenic focus. *Id.* J.K.J.G. was to complete an EEG, and then return for further assessment and treatment. *Id.*

On April 10, 2026, J.K.J.G. experienced a seizure episode while attending an ABA therapy session. ECF No. 45 at 7. The incident report from the ABA staff indicated that J.K.J.G. had fallen down, "was showing signs of not being alter, [and] then lost control of his core and neck." *Id.* at 12. The event lasted for approximately 20 minutes, and J.K.J.G. was unresponsive for two minutes. *Id.* The staff then called 911.[10] *Id.*

The following day, on April 11, 2026, J.K.J.G. underwent an EEG study. ECF No. 46 at 6. The study found "mild diffuse slowing with slow background frequencies expected for age" but "no focal or epileptiform abnormalities" and no seizures. *Id.* The overall impression was "mild diffuse cerebral dysfunction of non-specific cause. . . . Push-button events are not seizures." *Id.*

---

[10] No record of an emergency response to this incident has been filed.

J.K.J.G. completed another EEG on May 11, 2026. ECF No. 45 at 5. The EEG found epileptiform abnormalities in the form of "occasional bursts of rhythmic, anterior predominant, generalized 2.5-3 Hz spike and slow waves, lasting [one to three] seconds." *Id.* The overall impression of the EEG was "abnormal in the awake, drowsy[,] and asleep states" but the study found "no definite seizures or push button events." *Id.*

On May 28, 2026, Petitioners returned to Dr. Siddiqui to discuss the results of J.K.J.G.'s EEGs. ECF No. 48 at 12. Petitioners reported that J.K.J.G. experienced seizures four to five times per day, "with staring, 'zoning in and out.' Postictal afterwards with decreased coordination." *Id.* at 13. He continued ABA therapy and was still nonverbal. *Id.* After reviewing J.K.J.G.'s EEG results, Dr. Siddiqui opined that he "does not yet fit a specific epilepsy diagnostic category; I presume his epilepsy was related to his autism. Genetic testing was apparently negative."[11] *Id.* at 17. Dr. Siddiqui considered the possibility of absence seizures, but given his age, she opined that "focal unaware seizures are more likely." *Id.* She instructed J.K.J.G. to start Keppra and asked that Petitioners follow up with her in three months. *Id.*

No other medical records were filed.

## III.    Discussion

In order for Petitioners to prosecute their case, they must provide evidence of a vaccine-caused injury lasting longer than six months following the first alleged symptom. Petitioners' response to the Respondent's Rule 4(c) report recounted that J.K.J.G.'s initial febrile seizure occurred approximately five hours after vaccination on August 13, 2024; therefore, a six-month injury would extend through mid-February of 2025. They further identified two additional convulsions on November 4, 2024, and December 1, 2024, and assert that these three events together are related "complex febrile seizures." ECF No. 37 at 3–4. Petitioners argue that these events caused J.K.J.G. to suffer from the "[GDD]/autism-related care considerations" he was diagnosed with in September 2025, thus satisfying the six-month severity requirement. *Id.* at 4–5.

Petitioners also contested Respondent's characterization of J.K.J.G.'s injury as a "simple febrile seizure;" however, this argument is best characterized as Petitioners' disagreement with J.K.J.G.'s treating physicians. ECF No. 37 at 4; *see also* Pet'r's Ex. 1 at 9 (Dr. Thurm diagnosing J.K.J.G. with a simple febrile seizure on August 13, 2024), 136 (PA Shumway diagnosing J.K.J.G. with a simple febrile seizure on November 1, 2024). In fact, the only mention of a complex febrile seizure in the record is Petitioners' own statement of J.K.J.G.'s condition to the behavioral analyst who diagnosed him with ASD. *See* ECF No. 25 at 5. Furthermore, Petitioners did not point to any diagnostic criteria or literature that would support J.K.J.G.'s symptoms having been the result of a complex febrile seizure. More importantly, even if J.K.J.G. did suffer from complex febrile seizures, his most recent seizure occurred on December 1, 2024, less than four months after he received the vaccines in question, and thus does not satisfy the six-month severity requirement.

---

[11] No record of genetic testing was ever filed.

Petitioners have been afforded a total of 119 days to file evidence to address the deficiencies outlined in Respondent's Rule 4(c) report, in addition to the nearly two years their case has been pending but have failed to do so. Specifically, Petitioners were informed they needed evidence to support their assertion that J.K.J.G.'s seizures were manifestations of a complex febrile seizure condition to meet the six-month severity requirement and to identify a biological mechanism for vaccine causation. *See* ECF Nos. 35, 40. Without such evidence in the medical record, Petitioners were given the opportunity to obtain a medical expert and seek counsel for assistance. *Id.* Petitioners noted the difficulties they had experienced obtaining counsel due to the autism label but did not describe any attempts to obtain a medical expert. Instead, the evidence filed by Petitioners indicates that all of the neurologists who have treated J.K.J.G. since his initial seizure on August 13, 2024, have attributed his cognitive symptoms to an underlying ASD diagnosis that is unrelated to his seizures. These treaters have maintained this opinion even as they ordered and evaluated the results from multiple EEGs, an MRI, and a CT scan. No treaters have identified an alternative etiology to J.K.J.G.'s symptoms, and none have considered his vaccines to be connected to his symptoms, despite Petitioners' insistence on this belief when reporting J.K.J.G.'s medical history. *See* Pet'r's Ex. 3 at 4 (leaving the care of Dr. Doherty after he advised them the vaccines did not cause J.K.J.G.'s injury); Pet'r's Ex. 1 at 119 (Petitioners telling Dr. Horvat that the seizure occurred in the setting of vaccination), 129 (Petitioners telling Dr. Finklestein that the seizure occurred in the setting of vaccination); ECF No. 25 at 5 (Petitioners telling the behavioral assessment clinic that J.K.J.G. suffered from complex febrile seizures after receiving vaccinations).

Without any supporting expert opinions, medical records, medical literature, diagnostic criteria, case reports, or any other form of evidence, Petitioners discount the opinions of multiple treaters and assert their belief that J.K.J.G.'s GDD/ASD-like symptoms resulted from an encephalopathy. This appears to be based wholly on the short temporal relationship between J.K.J.G.'s vaccines and his first seizure. They note that J.K.J.G. continues to receive treatment and request extensions to file updated medical records as their primary argument to not dismiss this case. However, these newly filed medical records have only served to substantiate prior records that categorize J.K.J.G.'s conditions as a series of simple febrile seizures and an unrelated ASD diagnosis. Given the amount of time that has transpired for Petitioners to obtain evidence and the state of the evidence currently presented, Petitioners have not alleged a viable vaccine-related injury that has lasted for six months.

Autism has been uniformly rejected as a possible vaccine-related injury in this Court after a long series of litigation related to this subject. *See Cedillo v. Sec'y of Health & Hum. Servs.*, No. 98 916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 89 Fed. Cl. 158 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010); *see also Hazlehurst v. Sec'y of Dept of Health & Hum. Servs.*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd sub nom. Hazlehurst ex rel. Hazlehurst v. Sec'y, Dep't of Health & Hum. Servs.*, 88 Fed. Cl. 473 (2009), *aff'd sub nom. Hazlehurst v. Sec'y of Health & Hum. Servs.*, 604 F.3d 1343 (Fed. Cir. 2010); *J.M. and V.M. v. Sec'y of Health & Hum. Servs.*, No. 2-10V, 2017 WL 7409771, at *6 (Fed. Cl. Spec. Mstr. Feb. 7, 2018) ("In none of the rulings since the test cases has a special master or judge found any merit in an allegation that any vaccine can cause autism."). Thus, Petitioners continued requests for extensions of time to file updated medical records will not cure the deficiencies in Petitioners' claim, specifically a failure to meet the severity threshold and a viable injury

Accordingly, Petitioners' case is DISMISSED **for failure to prosecute, specifically failure to provide evidence of an alleged injury that meets the severity requirement pursuant to Court orders. The Clerk shall enter judgment accordingly**.[12]

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master

---

[12] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.